UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BARBARA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00099-SEB-MKK |
| | ) | |
| DOUG COLLINS,[1] Secretary of Veterans | ) | |
| Affairs, Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Barbara Smith has brought this lawsuit against Doug Collins, the
Secretary of Veterans Affairs, following a series of events arising out of Ms. Smith's
employment with the Department of Veterans Affairs ("VA") at the Richard L.
Roudebush VA Medical Center ("Medical Center") in Indianapolis. Smith asserts claims
under four anti-discrimination statutes: the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*,
Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, the Family and Medical
Leave Act ("FMLA"), 28 U.S.C. § 2601 *et seq.*, and the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Now before the Court is
Defendant's Motion for Summary Judgment [Dkt. 53]. For the reasons outlined below,
that Motion is <u>GRANTED</u>.

---

[1] Under Federal Rule of Civil Procedure 25(d), the Court may automatically substitute a party
sued in his official capacity with his successor. Accordingly, Doug Collins, the current Secretary
of Veterans Affairs, is substituted as Defendant.

## Factual Background[2]

**General Background**

Barbara Smith is an African American woman, who, at the outset of this litigation, was 67 years old.  Dkt. 28.  From 1990 to the present, Ms. Smith has worked in the Medical Center's dialysis unit as a Medical Instrument Technician ("MIT").  In that role, she works with "approximately a dozen" other MITs, who, along with the unit's nurses, "provide dialysis treatment to patients."  Dkt. 54 at 2.  On March 18, 2019, Vladimir Blinchevsky became the VA's Dialysis Unit Manager, and thus Ms. Smith's supervisor.  Mr. Blinchevsky is a white man who was 38 years old at the commencement of the litigation.  Dkt. 67-22 at 1.

**Plaintiff Complains of Hostile Work Environment**

At some point in 2021, Mr. Blinchevsky instructed the MITs and nurses in the dialysis unit to keep the lights on over the patient care areas at all times to ensure that medical staff had sufficient light to see while they worked. The lights were permitted to be dimmed only "over the nurses' stations as needed."  Dkt. 53-8.  Differences in approaches to enforcing this directive led to conflicts between Ms. Smith and the other MITs.  Specifically, Ms. Smith testified that the other MITs failed to follow Mr.

---

[2] The VA included in its factual recitation several instances of discipline that Ms. Smith received years before the events underlying this litigation occurred.  We have omitted discussion of Ms. Smith's past disciplinary record here as it is not relevant to the issues before us for determination.

Blinchevsky's instruction and would turn lights off in the patient area in response to patient requests[3] and become angry with Ms. Smith when she would turn them back on.

Following one such incident, on August 4, 2021, Ms. Smith emailed Mr. Blinchevsky and Angela Diskey, VA's Chief of PCS Procedural Medicine, to report that a female coworker yelled at Ms. Smith for turning on the lights in the patient waiting area, shouting, "[Y]ou are not working in this area[,] I am[,] you [wh]ore." Dkt. 67-15 at 1. When Ms. Smith explained that the patients needed to be able to see, the coworker "got in [Ms. Smith's] face" and said in front of patients and staff, "What are you going to do about it[,] you [wh]ore[?]" *Id.* Ms. Smith stated in her email to Mr. Blinchevsky and Ms. Diskey that she felt she was being bullied and subjected to a hostile work environment by her coworkers because they did not want to work with the lights on, when she was simply trying to follow the unit's policies. *Id.*

Ms. Smith claims that the VA never addressed this complaint, although Mr. Blinchevsky did subsequently modify the policy regarding the lights in the dialysis unit to clarify the manner in which it was to be applied. Dkt. 53-1 at 139–40.

**Position Upgrade for Dialysis Technicians**

In January 2022, the VA determined that all MITs at the Medical Center, including Ms. Smith, should be upgraded from a GS-7 to a GS-8 on the pay scale because they were performing job duties above the GS-7 level and MITs at other VA hospitals were

---

[3] As explained by Ms. Smith in her deposition, because dialysis takes several hours, some patients request that the lights be turned off so that they can sleep while undergoing the procedure. Dkt. 53-1 at 134.

being paid at the GS-8 level.  Dkt. 28 at 5; Dkt. 53-1 at 51–54; Dkt. 53-10 at 5.  This upgrade was retroactive back to 2006, meaning that the VA was required to individually calculate the amount of backpay owed to each of its MITs, depending on the number of years they had worked at the VA.  Dkt. 53-1 at 58–59; Dkt. 53-10 at 5.  Ms. Smith has received multiple installments of backpay owed to her as a result of this upgrade but maintains that she is still owed at least $30,000 more.  Dkt. 53-1 at 275.  According to Ms. Smith, several other MITs under the age of 40, who, like her, are supervised by Mr. Blichevsky, have received their full backpay, including Katie Low, April Haney, Alexis Peddie, September Cain, V. Patrick, and Reokis McKinley.  Apparently, she believes this delay in her receipt of backpay is discriminatory based on her age.

**Plaintiff Complains of Sexual Harassment**

On February 1, 2022, Ms. Smith complained to Mr. Blinchevsky of sexually harassing conduct by a male coworker, who, like Ms. Smith, worked as an MIT.  Ms. Smith reported that on January 26, 2022, the coworker was cleaning the floor in the dialysis unit, and, when Ms. Smith pointed out that he had missed a spot, he called her a "trifling ass."  Dkt. 53-15 at 2.  According to Ms. Smith, this was not the first instance of "disrespectful" conduct that the coworker had directed toward her.  Dkt. 53-1 at 165.  Approximately eight months earlier, in July 2021, the same individual had come over to Ms. Smith's workstation while she was speaking with a different male coworker and began "acting like he was jealous," stating, "that's my pussy," in reference to Ms. Smith.  *Id.* at 164.

Ms. Smith reported these incidents to Mr. Blinchevsky and her union representative, in response to which the VA commenced a fact-finding investigation into Ms. Smith's allegations.  On February 2, 2022, the day after Ms. Smith complained to Mr. Blinchevsky, Ms. Diskey emailed the VA's EEO Manager and requested assistance preparing "no-contact orders" for Ms. Smith and the coworker she had accused of sexual harassment, but it is not clear whether such orders were in fact ever issued.  Dkt. 67-1.  Ms. Smith's coworker was ultimately reassigned to work in another unit to prevent him from any further interactions with Ms. Smith.  Dkt. 53-1 at 173–74; *see also* Dkt. 53-15.

**Defendant Issues Plaintiff Written Counseling**

On February 2, 2022, Mr. Blinchevsky was informed by email that Ms. Smith was suffering from arm pain that "may limit her transporting clients via [wheel]chair" if "they are heavy."  Dkt. 67-1.  The next day, on February 3, 2022, Ms. Smith was detailed out of the dialysis unit to another Same Day Surgery/Post Anesthesia Care Unit while the VA conducted its fact-finding investigation into her sexual harassment complaint.  Dkt. 67-1.  While working in that unit, Ms. Smith's hours changed from an 8-hour shift to a 10-hour shift.  According to Ms. Smith, she requested a return to the dialysis unit because she did not want to change her shift or transport patients.

It is not clear the exact date that Ms. Smith was transferred back to the dialysis unit, but by at least February 10, 2022, she had returned to that workplace.  A few days later, on February 14, 2022, Mr. Blinchevsky issued to Ms. Smith a written counseling for failing to follow supervisor instructions in connection with an incident involving another MIT, September McClain, that occurred on February 10.  Dkt. 53-12.  Ms. McCain was

assigned for the February 10 shift to be an "assistant" or "floater," a position that is regarded generally as unpopular among MITs.  According to Ms. Smith, at the beginning of their shift, Ms. McCain asked to trade assignments, and Ms. Smith refused.  Later that morning, Ms. McCain complained to Mr. Blinchevsky that Ms. Smith had "refused her help to expedite getting patients in the unit and on treatment."  Dkt. 52-12.

After Mr. Blinchevsky received the complaint from Ms. Smith's coworker, he visited the unit to verify that Ms. Smith was busy cleaning one dialysis station and stated that the "float MIT" (Ms. McCain) would retrieve the next patient from the waiting room to start treatment at another station while Ms. Smith finished.  *Id.*  The written counseling states that, despite this instruction, Ms. Smith refused to accept help, responding, "No, I will do it."  *Id.*  The written counseling notes that Ms. Smith's conduct "delay[ed] patient treatment" and "that [Mr. Blinchevsky and Ms. Smith] ha[d] previously discussed," both individually and in at least one staff meeting, the expectation that MITs are to accept assistance from coworkers when a shift on the dialysis floor is busy.  Dkt. 53-12.

Ms. Smith denies having refused to accept help from Ms. McCain.  According to Ms. Smith, neither Ms. McCain nor Mr. Blinchevsky ever issued a verbal request that she allow Ms. McCain to assist in getting patients onto treatment. Dkt. 53-1 at 146–47, 48.

**Plaintiff Files an EEO Complaint Regarding Written Counseling**

A few weeks after receiving the February 14, 2022 written counseling, Ms. Smith filed an EEO complaint stating that, during her February 10, 2022 shift, Ms. McCain had "rush[ed] her and [stood] in her personal space while she was trying to operate the machine" and had "spread[] false information" about Ms. Smith to Mr. Blinchevsky.  Dkt.

53-13.  That EEO Complaint also alleged that Mr. Blinchevsky watched Ms. Smith closely following the incident, "like she didn't know how to perform her job duties," and that Mr. Blinchevsky generally overlooked Ms. Smith's input on matters pertaining to job assignments in favor of the ideas of younger employees.  *Id.* at 1.  (Ms. Smith ultimately withdrew this complaint in April 2022, following a mediation with Mr. Blinchevsky because she believed that in the future he would have "a better understanding of what was going on in the unit" and "everything was going to be okay and get better."  Dkt. 53-1 at 155–56; Dkt. 68 at 11.)

**Plaintiff's FMLA Leave Request**

The day following her receipt of the written counseling, on February 15, 2022, Ms. Smith submitted a request for FMLA leave to the VA's human resources department. Specifically, Ms. Smith sought FMLA leave to address problems of depression and chronic pain in her neck and arm. Dkt. 53-16 at 4–5, 7.  On February 26, 2022, Stella Williams, a Human Resources Specialist with the VA, approved Ms. Smith's FMLA request, authorizing Ms. Smith to take intermittent leave through February 14, 2023, to secure counseling services for her depression and physical therapy sessions to address her chronic pain.  Dkt. 53-16 at 7; Dkt. 53-1 at 121–22.

**Complaints Against Plaintiff and Fact-Finding Investigation**

In late April 2022, a VA nurse, Shelley Gaviola, complained to Mr. Blinchevsky about an interaction she had had with Ms. Smith on April 26, 2022, when Ms. Smith "became angry" and refused to help another nurse complete a patient's chart, as Ms. Gaviola had directed her to do.  Dkt. 53-17.  When asked about the incident, Ms. Smith

said that when she told Ms. Gaviola that she did not remember how to complete the task, Ms. Gaviola "holler[ed] and scream[ed]" at her for not knowing how to close the patient's chart, despite having previously been taught the process. Dkt. 53-1 at 187–89.

On May 14, 2022, one of Ms. Smith's coworkers, Alex Preddie, complained to the VA that Ms. Smith had "[i]nvaded [her] personal space," "got face to face" with her, and "told [her] not to be nosey." Dkt. 53-17. Later, when interviewed about this complaint, Ms. Preddie reported that Ms. Smith "came up very close to [her]" when Ms. Preddie was getting a patient hooked up to the dialysis machine and stated that she (Ms. Smith) would put the patient onto the machine. *Id*. When Ms. Preddie told Ms. Smith that she (Ms. Preddie) would handle it because Ms. Smith had three other patients in the waiting room, Ms. Smith responded, "Oh, don't come over into my section being bossy." *Id.*

On June 14, 2022, Ms. Gaviola filed an EEO complaint regarding the April 2022 confrontation with Ms. Smith. In her complaint, Ms. Gaviola expressed her "concern[]" about the safety of the veterans and her own safety when working with [Ms. Smith]," and stated that Ms. Smith "remains confrontational when approached, displays unprofessional behavior, and is insubordinate." Dkt. 53-17. The VA convened a fact-finding investigation into Ms. Smith's conduct following Ms. Gaviola's EEO complaint. VA Project Manager Sasha Novak conducted the investigation, which extended over several weeks and included interviews of more than twenty-five employees in the dialysis unit, including Ms. Gaviola, Ms. Preddie, Mr. Blinchevsky, and Ms. Smith. Dkt. 53-17. (Prior to being interviewed by Ms. Novak as part of this fact-finding investigation, Ms. Smith had not previously known Ms. Novak.)

**Plaintiff Submits Notice of Medical Condition**

The first week of June 2022, Ms. Smith submitted to Mr. Blinchevsky a note dated May 31, 2022, signed by Kristin Jones, a nurse practitioner at Ascension Medical Group, stating that Ms. Smith had been diagnosed with "fibrosis of the lungs which is a chronic underlying medical condition and increases her risk of long-term complications of COVID 19 if she were to contract the virus." Dkt. 53-19. The note further stated that Ms. Smith should "not assist in dialysis of COVID 19 positive patients to decrease this risk." *Id.*

According to Ms. Smith, her lung condition affects her breathing, causing her to "get tired fast" and "get sick easier than a normal person with a normal problem." Dkt. 53-1 at 178. She also testified that she must "be careful what [she] inhale[s]" because if she "inhale[s] the wrong thing," her "heart flutters and races." Dkt. 53-1 at 182. She testified by affidavit that her condition affects her when she "breath[es] bad air and chemical spray or perfume[] spray," but that she is "capable of [doing] everything [she] wants right now." Dkt. 53-2 ¶¶ 27–28. While her medical condition causes her "[n]o physical work restrictions," she cannot "dialyze Covid [19] positive [] patients." *Id.* ¶ 33.

**Plaintiff's Temporary Work Assignment During Fact-Finding Investigation**

In June 2022, the VA assigned Ms. Smith to work on the eighth floor of the Medical Center for the duration of the fact-finding investigation. The eighth floor is dedicated to inpatient care and Ms. Smith remained there on temporary assignment until August 3, 2022. Dkt. 53-20; Dkt. 53-1 at 197–98. Ms. Smith maintained the same pay and benefits while on temporary assignment, but her hours changed from 6:00 a.m. to

2:30 p.m. to 7:30 a.m. to 4:00 p.m.  Dkt. 53-1 at 198–99.  A nurse in the dialysis unit informed Ms. Smith that when Mr. Blinchevsky announced that she (Ms. Smith) was being detailed out of the unit, there was applause from other members of the unit, which Mr. Blinchevsky did not attempt to stop.  Dkt. 53-1 at 246–47.

While assigned to the eighth floor, Ms. Smith informed the nurse manager, Amy Sortore, that she could not work with patients who were positive for COVID-19 due to her lung condition.  Dkt. 53-2 at 11.  Ms. Smith testified that Ms. Sotore responded that she "had to do the COVID patients regardless" because Ms. Smith's supervisor had said that the "doctor's statement ha[d] no [g]rounds."  Dkt. 53-1 at 249.  Ms. Sotore then directed Ms. Smith to "go to reasonable accommodation."  Dkt. 53-2 ¶ 52(b).  Ms. Smith testified that, after her conversation with Ms. Sortore, she continued to work with COVID-19 patients during her temporary assignment on the eighth floor but would "gown up real good with extra mask protection" and have "coworkers … switch assignment[s] with [her]" whenever possible.  *Id.* ¶ 52(e); *see also* Dkt. 53-1 at 197–98; Dkt. 53-10.

**Plaintiff Receives Reprimand and Files Second EEO Complaint**

On July 28, 2022, Ms. Novak prepared her report based on the fact-finding investigation into Ms. Smith's conduct toward coworkers, concluding that "[Ms.] Smith has repeatedly demonstrated hostile and inappropriate conduct towards employees in the Chronic Dialysis Unit."  Dkt. 53-17.  Further, the report noted that Ms. Smith's "hostility towards co-workers ha[d] been taking place for multiple years," and was "demonstrated in the form of intimidation, insubordination, unprofessional communication and body

language, confrontation, unwelcomed physical contact, and instigation of conflict," and had "created a hostile environment with her co-workers, decreased team morale, and increased risk of veteran and co-worker harm." *Id.* Ms. Novak recommended that Ms. Smith "receive[] disciplinary action up to relocation of service or removal from federal service." *Id.*

Approximately seven weeks thereafter, on September 12, 2022, Ms. Diskey issued a written reprimand to Ms. Smith for "Failure to Follow Instructions." Dkt. 53-22. However, this reprimand was based on conduct unrelated to the complaints filed by Ms. Gaviola and Ms. Preddie that had been investigated by Ms. Novak. Dkt. 53-22.

Shortly after receiving this reprimand, Ms. Smith filed another EEO complaint in which she alleged, among other things, that she had been written up in retaliation for having filed her first EEO complaint, that she had been denied her pay increase and backpay, and was being subjected to a hostile work environment and age discrimination. Dkt. 53-10. On December 12, 2022, the VA's Office of Resolution Management, Diversity and Inclusion ("ORMDI") accepted Ms. Smith's EEO complaint, containing the following claims:

> Whether complainant was subjected to a hostile work environment based on Age, Disability, Race (Black) and Reprisal when: a) since April 19, 2022, her co-workers complain when she turns the lights on and she is required to provide advance request for leave; b) on May 19, 2022, management failed to take action regarding her accusation of harassment from her co-workers; c) on June 24, 2022, she became the subject of a fact-finding investigation and her COVID documentation was not accepted; d) on August 19, 2022, she was issued a proposed reprimand; e) on August 31, 2022, the results from a fact finding investigation recommended she receive disciplinary action, relocation of service, or removal from employment; and includes the following timely raised independently actionable claim:

11

(1) Since April 19, 2022, she has not been promoted to GS-8.
(2) Since April 19, 2022, she has not received back pay.
(3) From June 24, 2022, through August 4, 2022, she was moved to the "COVID" floor.
(4) On September 12, 2022, she was issued a Reprimand.

Dkt. 67-28 at 1–2.

**The Instant Litigation**

Ms. Smith commenced this lawsuit on January 16, 2024, which was amended on May 23, 2024, alleging that the VA had subjected her to a hostile work environment; discriminated against her on account of her disability, race, and age, in violation of the Rehabilitation Act, Title VII, and the Age Discrimination in Employment Act ("ADEA"), respectively; and retaliated against her for engaging in statutorily protected activity under Title VII, the Rehabilitation Act, and the FMLA.

On January 30, 2025, Defendant filed a Motion for Summary Judgment, accompanied by a supporting brief. Dkt. 53–54. Ms. Smith responded on April 19, 2025, dkt. 68, and the VA filed a reply on May 23, 2025, dkt. 73. The motion is thus fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Discussion

Ms. Smith claims that the VA discriminated against her based on her disability (by failing to reasonably accommodate her), her race, and her age, in violation of the Rehabilitation Act, Title VII, and ADEA, respectively; retaliated against her for engaging in statutorily protected activity under the Rehabilitation Act, Title VII, and the FMLA; and subjected her to a hostile work environment. The VA seeks summary judgment on each of Ms. Smith's seven claims. We address each claim in turn below.

### A. Disability Discrimination Under the Rehabilitation Act

The Rehabilitation Act prohibits discrimination against qualified employees with a disability solely because of the disability and requires an agency to offer a reasonable accommodation for such qualified persons. *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019). The standards for discrimination under the Rehabilitation Act are the same as under the Americans with Disabilities Act. *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020).

Here, Ms. Smith contends that the VA failed to reasonably accommodate her disability when it denied her request to be excused from dialyzing COVID-19 positive patients due to her diagnosis of fibrosis of the lungs. A failure to accommodate claim

under the Rehabilitation Act generally "requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably." *Scheidler v. State of Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). The VA seeks summary judgment on this claim arguing that Ms. Smith failed to establish that she is disabled and/or that she never requested a reasonable accommodation.

The Rehabilitation Act defines an individual with a disability borrowing the definition of that term from the ADA and its amendments, to wit, an individual who has "(A) has a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) has a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see* 29 U.S.C. § 705(9)(b) (noting that the Rehabilitation Act's definition of disability refers to the ADA). To be substantially limiting, an "impairment need not prevent or significantly or severely restrict, the individual from performing a major life activity," (29 C.F.R. § 1630.2(j)(1)(ii)); rather, the impairment need only "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* Major life activities include breathing. *Lohmeier v. Gottlieb Mem. Hosp.,* 147 F.4th 817, 829 (7th Cir. 2025).

Ms. Smith contends that her pulmonary fibrosis substantially limits her in the major life activity of breathing. The VA does not dispute that breathing is considered a major life activity under the Rehabilitation Act but contends that Ms. Smith has failed to present evidence to establish that her condition substantially limits her ability to breathe.

14

To prevail at summary judgment, Ms. Smith is required to show that a triable issue of fact exists regarding whether her breathing due to the pulmonary fibrosis condition is limited in a substantial way in comparison with the general population.[4]  We agree with the VA that Ms. Smith has failed to adduce evidence to permit a reasonable factfinder to draw this conclusion.

We begin with the fact that the only evidence presented by Ms. Smith regarding her limitations is her own testimony in which, in the broadest possible terms, she states that her fibrosis causes her to "get tired fast" and to "get sick easier than a normal person with a normal problem."  Dkt. 53-1 at 178.  Beyond these general and conclusory assertions, Ms. Smith has testified only that her fibrosis requires her "to be careful what [she] inhale[s]" because "breathing the wrong thing" causes her to have "difficulty breathing" and her "heart [to] flutter[] and race[]."  *Id.* at 182.  While Ms. Smith is not required to present medical expert testimony to establish disability, this vague testimony, unaccompanied by *any* detail regarding the frequency, duration, or severity of the effects of her condition, lacks the specificity required at the summary judgment stage to permit any reasonable factfinder to find that her breathing ability is significantly limited as compared to the general population.  *See Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 522–23 (7th Cir. 2009) ("Vague assertions of difficulty performing a major life activity do not create a genuine issue of material fact, particularly when unaccompanied

_____

[4] Ms. Smith's response in opposition to the VA's motion for summary judgment contains a conclusory reference to the evidence also establishing that she has "a record of disability" and/or that she "was regarded as having a disability within the meaning of the Rehabilitation Act," (Dkt. 68 at 24), but neither argument is sufficiently developed, and, as such, has been waived.

by any evidence that the limitation is substantial compared to that of other adults.") (citation omitted).  At most, Ms. Smith's health condition is anticipatory of any actual limitation or disability; she must be "careful" in order to prevent possible symptoms from occurring.  She cites no substantial limitations, only a cautionary posture.  That is not enough to prevail on a claim of an impairment under the Rehabilitation Act.

Because Ms. Smith has failed to adduce sufficient evidence from which a reasonable jury could find her disabled under the Rehabilitation Act, her reasonable accommodation claim thus fails at the first element, removing any need for us to address the parties' arguments regarding the remaining elements of her claim.

### B.  Race Discrimination Under Title VII

Ms. Smith also claims that the VA discriminated against her based on her race, in violation of Title VII, when it denied her request to be excused from working with COVID-19 positive patients due to her pulmonary fibrosis diagnosis.  "To succeed on a Title VII discrimination claim, an employee must prove (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citation omitted). Title VII claims of race discrimination "simply require that race be 'a motivating factor in the defendant's challenged employment decision.'"  *Id.* (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020)).

At summary judgment, regardless of which method of proof is used by the plaintiff, the Court assesses whether the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment

action." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).  In making this determination, "courts must assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' regardless of whether the court also analyzes the evidence pursuant to *McDonnel Douglas*."[5]  *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Ortiz*, 834 F.3d at 765).  Here, neither party uses the *McDonnell Douglas* framework; accordingly, we follow their lead and consider only whether, viewing the evidence holistically, a reasonable factfinder could conclude that race was a motivating factor in the VA's denial of Ms. Smith's request to be excused from working with COVID-19 positive patients.

To support her race discrimination claim, Ms. Smith again relies solely on her own testimony that she was told by her supervisor, Mr. Blinchevsky, that another MIT he supervised, who is white, had been excused from working with COVID-19 positive patients after that MIT had submitted a doctor's note to the VA indicating that she had an underlying condition of rheumatoid arthritis.  Ms. Smith contends that a reasonable jury could find, based on her testimony that a white employee who shared the same position

---

[5] Under the *McDonnell Douglas* framework, the plaintiff must first demonstrate a *prima facie* case that she (1) belongs to a protected class, (2) was meeting her employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class.  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).  Assuming that the plaintiff satisfies each element of her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action, at which point the burden returns to the plaintiff to show that the defendant's reason was pretextual.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

and supervisor was treated more favorably that she, that race was a motivating factor in the VA's decision-making.

"To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was 'directly comparable to her in all material respects' so as to 'eliminate other possible explanatory variables.'" *Gamble v. Cnty. of Cook*, 106 F.4th 622, 626 (7th Cir. 2024) (quoting *Downing v. Abbott Lab'ys*, 48 F.4th 793, 805 (7th Cir. 2022)).  In other words, "at base, the purpose of the similarly situated inquiry is to eliminate other possible explanatory variables, … [to] isolate the critical independent variable—discriminatory animus." *Smith v. City of Janesville*, 40 F.4th 816, 823 (7th Cir. 2022) (citation modified).  "Although the number of relevant factors depends on the context of the case, in the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (citation modified).

Here, Ms. Smith has failed to present sufficient evidence to permit a reasonable factfinder to conclude that her purported comparator is in fact similarly situated such that any disparate treatment they may have received can be attributed to race.  The extent of Ms. Smith's testimony is that Mr. Blinchevsky told her that the other MIT "has a doctor's statement" providing that she "has rheumatoid arthritis," which is "the reason why she can't deal with Covid patients."  Dkt. 53-1 at 249, 272–73.  While there is no dispute that Ms. Smith and her proffered comparator held the same position, were subject to the same

standards, and shared the same direct supervisor (Mr. Blinchevsky),[6] the record is devoid of *any* other details regarding the relevant circumstances, including when the decision as to the other MIT was made, the exact content of the doctor's note (in contrast to the Nurse Practioner's directive provided by Ms. Smith) that the MIT provided to the VA, and, most importantly, the identity of the decisionmaker.

It is therefore unknown, for example, whether the VA's respective decisions on Ms. Smith's and her purported comparator's requests were made in close time sequence or were made more remotely such that outside factors, including the severity of the COVID-19 pandemic at the time each decision was made, could distinguish the VA's treatment of the requests. Nor has any evidence been adduced establishing whether the other MIT sought approval for an accommodation from her direct supervisor, as Ms. Smith did, or instead submitted her accommodation request to the VA's Local Reasonable Accommodation Coordinator, which Ms. Smith did not do. Thus, it is not clear whether the decisionmakers were the same. Further, it is not clear whether the disparate diagnoses as to the underlying medical condition—i.e., pulmonary fibrosis vs. rheumatoid arthritis—was a non race-based factor impacting the differing decisions by VA supervisors. Because different decisionmakers may rely on different factors when deciding whether to approve an employee's request for accommodation, without knowing whether the decisionmakers were the same or what the basis for the decisions were, we

---

[6] We note that, at the time Ms. Smith asked not to be assigned to work with COVID-19 positive patients, she was temporarily assigned to the eighth floor and was being supervised there by Ms. Sortore. However, Ms. Smith has testified that Ms. Sortore had consulted Mr. Blinchevsky in denying her request.

cannot find that the other MIT is a suitable comparator. *See Mourning v. Ternes Packaging, Ind., Inc.*, 868 F.3d 568, 571 (7th Cir. 2017) (holding that "to be an adequate comparator" plaintiff would need to show the comparator "was treated more favorably … by the same decisionmaker").

"Summary judgment is the 'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).  Because Ms. Smith has failed to adduce sufficient evidence from which a reasonable factfinder could conclude that she and her purported comparator were similarly situated, and she has identified no other evidence to support her race discrimination claim, the VA is entitled to summary judgment on this claim.

## C. Age Discrimination Under the ADEA

Ms. Smith also claims that the VA discriminated against her based on her age, in violation of the ADEA, when it denied her request to be excused from working with COVID-19 positive patients.  Alternatively, Ms. Smith argues that the VA's failure to timely provide her all the backpay she was owed because of the upgrade of all MITs in the Medical Center to a GS-8 designation constitutes age discrimination, in violation of the ADEA.  The VA contends that Ms. Smith has failed to adduce sufficient evidence under either theory to avoid summary judgment.  We address the parties' arguments in this regard, in turn below.

Similar legal standards apply to both Title VII and ADEA discrimination claims, meaning that to succeed on her ADEA claim, Ms. Smith must prove "(1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3)

causation." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).  As a federal employee, Ms. Smith need not show but-for causation, but instead only that "age played a part in [the] employment decision." *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022) (citing *Babb v. Wilkie*, 589 U.S. 399, 402 (2020)).

The primary evidence adduced by Ms. Smith in support of her first theory under the ADEA is identical to the evidence on which she relied for support of her race discrimination claim, to wit, her testimony that Mr. Blinchevsky had told her that an MIT substantially younger than she was excused from working with COVID-19 patients due to an underlying condition of rheumatoid arthritis while Ms. Smith's comparable request was denied.  Based on the same analysis explicated previously in reference to her race discrimination claim, we hold that this testimony, which does not establish even that the VA's decisions regarding Ms. Smith's and the younger MIT's requests were made by the same decisionmaker, is not sufficient to permit a reasonable factfinder to conclude that she and her purported comparator were similarly situated such that any differential treatment they received could be attributed to age as opposed to other nondiscriminatory factors.

The only additional evidence adduced by Ms. Smith to support her age discrimination claim is her testimony that Mr. Blinchevsky once commented to her that she had "too much gray hair."  Dkt. 53-1 at 233.  While it is true that stray comments by a decisionmaker may constitute evidence of discrimination if they are "contemporaneous with … or causally related to the … decision making process," *Sheehan v. Donlen Co.*, 173 F.3d 1039, 1044 (7th Cir. 1999), here, Ms. Smith does not remember when Mr.

Blinchevsky made this comment, nor whether it was made in connection with any adverse employment decision that she is challenging in this lawsuit. As such, the relevance of such an isolated (and ambiguous) comment is greatly limited, and wholly insufficient on its own or when considered in conjunction with Ms. Smith's testimony regarding her purported comparator, for any reasonable factfinder to conclude that age was a motivating factor in the VA's denial of her request to be excused from working with COVID-19 positive patients.

Ms. Smith's claim that the VA's failure to timely calculate and pay over to her all the backpay that she was owed, due to the upgrade of all MITs in the Medical Center to a GS-8 designation, constitutes age discrimination, in violation of the ADEA, fares no better. In her affidavit, Ms. Smith lists the names of several other MITs supervised by Mr. Blinchevsky she claims had received the full amount of backpay they were owed, all of whom Ms. Smith contends were under the age of 40. While similarly situated employees need not be "identical," Ms. Smith must still adduce sufficient evidence to show that, in addition to dealing with the same supervisor and being subject to the same standards (which she has shown here), her purported comparators "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [their] conduct or the employer's treatment of [them]." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (citation modified). Beyond listing the names of her purported proffered comparators, Ms. Smith provides no further details about the younger employees to enable a reasonable factfinder to conclude that they were in fact similar enough to her to be appropriate comparators.

22

Most important, we do not know the date each of Ms. Smith's proposed comparators started working for the VA; thus, we do not know the years or other time periods for which each was entitled to backpay. Ms. Smith's tenure with the VA entitled her to sixteen years of backpay, we are informed, which was the maximum available to any of the MITs, given that the entitlement to backpay payment was retroactive only to 2006. Dkt. 53-1 at 57. Ms. Smith testified that the number of years of backpay available to other MITs was dependent on the length of time they had worked for the VA, and that each year of backpay needed to be calculated separately. *Id.* at 58–59. Without any evidence that Ms. Smith's proposed comparators' entitlement periods were similar to hers, it is impossible for any reasonable factfinder to conclude that the VA's delay in calculating and remitting the full amount of Ms. Smith's backpay in comparison to her proposed comparators was more likely than not due to age discrimination rather than the nondiscriminatory explanation that backpay calculations for longer tenured employees like Ms. Smith were likely more complicated and thus more time consuming than the calculations of employees with shorter tenures with the VA, particularly in light of Ms. Smith's testimony that each year of backpay had to be calculated separately for each employee.[7] Accordingly, based on the record before us, we cannot hold that the

---

[7] The VA submitted the affidavit of Katherine Ashby, a Supervisory Human Resources Specialist who was the Medical Center employee primarily responsible for processing the backpay for the MITs, as well as a series of emails between Ms. Ashby and an EEO investigator in which she explained the process she used to calculate the MITs' backpay and provided a nondiscriminatory explanation for the delay in calculating and processing Ms. Smith's backpay. Ms. Ashby's affidavit is admissible on summary judgment, but the email statement relied upon by the VA is not contained in her affidavit or incorporated therein and was not signed under penalty of perjury. Accordingly, we will not consider it in support of the VA's summary judgment motion. This does not affect our determination that Ms. Smith has failed to adduce sufficient evidence to

employees Ms. Smith has identified are suitable comparators.  For these reasons, the VA is entitled to summary judgment on Ms. Smith's ADEA claims.

### D.  Retaliation Claims

Ms. Smith next claims that she was retaliated against for engaging in statutorily protected activity in violation of the Rehabilitation Act, Title VII, and the FMLA.  Both parties have addressed these claims collectively, so we will follow their lead and do the same.

"To establish a Title VII or Rehabilitation Act retaliation claim, [a plaintiff] must show that: '(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action.'" *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023) (quoting *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022)). Under these statutes, the plaintiff need not prove but-for causation in federal-sector retaliation cases such as this, but instead must establish only that "retaliatory animus played a part in [the] adverse employment action." *Huff*, 42 F.4th at 646.

Similarly, to prove a retaliation claim under the FMLA, the plaintiff must show that "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022) (citation omitted).  Under the FMLA, the plaintiff "does not need to prove that 'retaliation

---

permit a reasonable factfinder to conclude it is more likely than not that her age is the reason she did not timely receive her backpay, however.

was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008)).

Viewing the facts in the light most favorable to Ms. Smith, she engaged in statutorily protected activity on the following occasions: (1) February 1, 2022, when she complained of sexual harassment (Title VII); (2) February 2, 2022, when she told her supervisor she could not lift heavy patients because of arm pain (Rehabilitation Act); (3) February 15, 2022, when she submitted an FMLA leave request (FMLA); (4) late February 2022, when she filed EEO complaint (Title VII); and (5) June 2022, when she requested not to work with COVID-19 patients (Rehabilitation Act). Accordingly, she has satisfied the first element of her retaliation claims.

We turn next to consider the second required element of Ms. Smith's retaliation claims, to wit, whether she suffered an adverse employment action. Ms. Smith identifies the following adverse employment actions that she claims she suffered as a result of her protected activity: (1) February and June 2022 no contact orders; (2) February 2, 2022 and June 24, 2022 temporary assignments; (3) February 14, 2022 written counseling; (4) June 2022 fact-finding investigation; (5) September 12, 2022 written reprimand; and (6) delay in receiving backpay since April 2022.

The Title VII, Rehabilitation Act, and FMLA anti-retaliation provisions cover only "employer actions that would have been materially adverse to a reasonable employee," meaning that "the employer's actions must be harmful to the point that they could well

dissuade a reasonable worker from making or supporting a charge of discrimination."
*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  Examples of such actions might include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (citation modified).

As detailed below, we  do not find the "no-contact" orders, the written counseling, the written reprimand, or the February 2022 temporary assignment to have been material adverse employment actions.  As the Seventh Circuit has held, "a documented reprimand alone is not an adverse action absent some tangible job consequence."  *Scaife*, 49 F.4th at 1119 (citation modified).  Here, Ms. Smith has not shown that the written counseling or the written reprimand came "with a low performance rating or even a pay cut."  *Id.*  In the absence of any evidence of some tangible, material adverse consequence accompanying either the written counseling or the written reprimand, we cannot rule that they constituted adverse employment actions.

Likewise, the "no-contact" orders that Ms. Smith contends that she was issued in February and June 2022 do not rise to the level of materially adverse employment actions.[8]  These orders were issued while the VA was conducting its fact-finding investigations into Ms. Smith's complaint of sexual harassment and Ms. Gaviola's

---

[8] It is not clear that Ms. Smith was issued a no-contact order in February 2022 during the time when the VA investigated her sexual harassment complaint.  At best, the record shows that the VA was preparing to issue such an order, but there is no evidence that the order was ever actually issued.  Nonetheless, we will assume for purposes of this motion that such an order was issued.

complaint against Ms. Smith, respectively.  Although not entirely clear, we understand these orders to have restricted Ms. Smith from speaking with her coworkers about the subject of the complaints during the duration of each fact-finding investigation.  While Ms. Smith testified that the no-contact orders made her "feel like I'm a criminal" and "like I'm being put in jail for something I didn't do," (Dkt. 53-1 at 258), she conceded that she did not lose any pay or benefits in connection with their issuance, and, in fact, "nothing happened" to her as a result of the no-contact orders.  *Id.* at 206–07.  Given that these orders were temporary and resulted in no tangible negative job consequences, Ms. Smith has failed to establish that they satisfy the definition of a material adverse employment action.

Insofar as Ms. Smith argues that her temporary assignment in February 2022 to another patient unit in the Medical Center while her sexual harassment complaint was investigated was an adverse employment action, that argument fails.  Neither her pay nor her benefits were altered as a result of the assignment and, although she contends that her shift changed from 8 hours to 10 hours a day, when she requested a return to the dialysis unit due to the increase in her hours and her inability to lift heavy patients because of arm pain, she was returned to the dialysis unit after no more than one week on the temporary detail.  Under these circumstances, Ms. Smith has failed to establish that a "reasonable employee" would have found this one-week temporary assignment to be materially adverse such that it would dissuade them from engaging in protected activity, particularly where there was no diminishment in her responsibilities or any impact on her career prospects.  *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68–69.

27

Assuming that the initiation of the fact-finding investigation and the six-week temporary detail in June 2022 and the delay in receipt of backpay qualified as adverse employment actions, Ms. Smith has failed to establish the third element of her retaliation claims, to wit, that any of these actions was caused by her protected activity. The evidence establishes that the VA commenced the June 2022 fact-finding investigation into Ms. Smith's conduct only after a VA nurse filed an EEO complaint regarding her behavior and that Ms. Smith was temporarily detailed to the 8th floor of the Medical Center only until that fact-finding investigation was conducted. Ms. Smith has adduced no evidence to suggest that initiating an investigation into an EEO complaint and assigning the subject of the complaint a temporary detail while the investigation was completed are actions that were outside of the VA's standard protocols when investigating EEO complaints or presented any other evidence from which a reasonable factfinder could conclude these actions were pretext for retaliation. "Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance," even if that adverse action occurs after the plaintiff's statutorily protected activity. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015).

Finally, regarding Ms. Smith's contention that the VA retaliated against her by delaying its remittance of the backpay she was owed, there is no evidence that any such delay was the result of retaliation for protected activity as Ms. Smith had adduced no evidence that Ms. Ashby, the employee responsible for calculating Ms. Smith's backpay, was aware that Ms. Smith had engaged in protected activity at the time she was

28

performing the backpay calculations.  *See, e.g.*, *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) ("Knowledge of the protected activity is necessary to show causation for retaliation claim.").  "A supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity." *Id.* at 915–16.

For these reasons, the VA is entitled to summary judgment on Ms. Smith's retaliation claims brought pursuant to Title VII, the Rehabilitation Act, and the FMLA.

### E.  Hostile Work Environment Claim

Ms. Smith contends that the VA subjected her to a hostile work environment by issuing her two no-contact orders; assigning her to a six-week detail in a unit where she was uncomfortable having to wear a gown, mask, and gloves to work with COVID-19 positive patients; switching her schedule from 8-hour to 10-hour shifts; and being made the subject of multiple fact findings after coworkers complained about her conduct, causing her embarrassment.  The VA rejoins, first, that Ms. Smith waived her hostile work environment claim by failing to include any reference to it in her Statement of Claims, and second, even if not waived, the claim cannot survive summary judgment because the conditions she has identified are not objectively offensive, severe, or pervasive nor is there any evidence that the VA's actions were based on retaliatory animus.

"Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class

29

or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citations omitted). Determining "whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

Here, assuming that Ms. Smith did not abandon her hostile work environment claim by failing to include it in her Statement of Claims, that claim nonetheless fails on the merits. The conduct that Ms. Smith has cited in support of her hostile work environment claim, to wit, that the VA commenced a fact-finding investigation into complaints against her and issued her a no contact order and temporarily assigned her to another floor in the hospital (with the same pay and benefits) for six weeks while the investigation was conducted was neither severe nor pervasive such as is necessary to support a hostile work environment claim, based on the facts developed on the current record. *See West v. Illinois State Bd. of Educ.*, No. 07 C 2994, 2009 WL 3671683, at *8 (N.D. Ill. Nov. 2, 2009) ("[T]here is nothing inherently offensive, let alone hostile, about [the defendant] ordering [the plaintiff's] *temporary* assignment to another office to work with his supervisor on correcting his audit deficiencies.") (emphasis in original).

Although Ms. Smith contends that she was humiliated when she was told that Mr. Blinchevsky had failed to stop her coworkers from applauding upon learning of her temporary assignment, this one-time occurrence, which Ms. Smith did not witness but

only heard about after the fact, was not a sufficient basis on which to assert a hostile work environment claim. To the extent Ms. Smith maintains that the VA's change of her 8-hour work schedule to a 10-hour shift contributed to her hostile working environment, that argument lacks sufficient development to warrant our further consideration.

Additionally, we note that Ms. Smith has not argued nor identified any evidence showing that the VA harassed her because of any protected characteristic or her statutorily protected activity as required to support a hostile work environment claim. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir. 2009) ("In addition to demonstrating harassment so severe and pervasive that it altered the terms and conditions of her employment and created an abusive working environment, [the plaintiff] must demonstrate a link between the adverse treatment and [her protected class or statutorily protected activity]."). Accordingly, Ms. Smith's hostile work environment claim does not survive summary judgment.

## III.    Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date: _____9/29/2025_____          _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Julie C. Alexander
John H. Haskin & Associates, LLC
jalexander@jhaskinlaw.com

Adriana Figueroa
DOJ-USAO
adriana.figueroa@usdoj.gov

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com